The bill states that, about the 11th of Nov. in the year of our Lord, 1805, James and Jesse Turpin of Stuart county, being entitled by their father's entry to 440 acres of land, part of a tract of 640 acres lying partly in Smith county, to-wit, 285 acres, agreed, by writing under their hands, "to sell to William Stephenson a certain piece of land, or land warrant, containing six hundred and forty acres, and bind themselves in the sum of $150 to convey the right to the said William Stephenson which they June from their father, but if said land is not appropriated on the waters of Goose Creek, then only bound to convey the right to the warrant. The locator's part, 220 acres, reserved to King Carr, if land on Goose Creek be obtained. If one-half only be obtained on Goose Creek, then King Carr to have one-third of it. To make a special deed from them and their heirs when the patent comes forward," that the consideration of $150 was paid. William Stephenson died in September, 1806, leaving the plaintiff Irene his heir-at-law, before the patent for said land came forward to said Jesse and James. That the defendants, Esther and Wilson Yandle, *Page 110 
administered about the month of December, 1806. But though the administrators were not entitled to said agreement between William Stephenson and Jesse and James Turpin, which belonged to the plaintiff Irene, as heir-at-law of William Stephenson, yet the said Yandle, who exclusively took the management of said estate, brought an action in the name of the said Esther, as administratrix, against the said Jesse and James Turpin, and recovered judgment thereon for the sum of $1,890, and caused execution thereon to be levied on the 155 acres in Smith county, which said Esther purchased at $510, and afterwards an execution was issued against the part of the land lying in Sumner county, and 370 acres thereof were sold to Wilson Yandle for § 35; and it being discovered that a balance of said land remained unsold another execution is sued, and was levied thereon, being 114 acres, and sold also to Wilson Yandle for $10. The bill further states that one James Ogilvie obtained judgment against the said administrators, who had in their hands, that is to say in the hands of the said Yandle, assets more than sufficient to satisfy the same, at the instance of the said Yandle, which recovery was so managed that the plea of fully administered was found in favor of said Yandle, who had all the assets, and against the said Esther, who never had any of them. And it was procured by the said Yandle that an execution upon said judgment, at the instance of said Ogilvie, issued for the sum of $325, to be levied of the goods and chattels of the intestate in the hands of the said Esther, if to be found, but, if not, of the proper estate of the said Esther, which writ was levied on the 155 acres purchased by said Esther as aforesaid, and the same was sold to the defendant John Carr for $81 or thereabouts; the said Carr and Yandle having, before this sale, purchased the interest in the said judgment and execution from the said Ogilvie. The bill further states that Yandle and Carr, who had *Page 111 
become interested therein, sold 255 acres, part of the 370, by their joint deed, to the defendant Francis Marshall for the sum of $765. The answer of Yandle admits the entry of the Turpins; the agreement by Jesse, in the name of himself and James, with William Stephenson; answers the amount of the debits due the estate of William, his intestate, and the account of sales to be $493; says that an entry of William's for 228 acres, and a grant to Berry for 400, previous to the date of Turpin's entry, covered nearly 500 acres of Turpin's claim; admits an agreement with Esther Stephenson, the administratrix, that she should take out an attachment in her own name, upon the agreement between William Stephenson and the Turpin's, and that she should make the oath of the value, because she deemed the same more valuable than he did, and that judgment was recovered thereon to the amount of $1,890 and costs; and the Turpin land sold thereon, 155 acres in Smith county to Esther Stephenson for $510, paid by a credit on the judgment, and the balance of said land in Sumner, 370 acres, to himself for $35, and 114 acres also to himself for $10. He admits also the suit brought by Ogilvie and judgment recovered in the sum of $325, and the claim of the said Esther to the said 155 acres sold thereby to the defendant for $81.64. James Turpin, in his answer, denies the entering into the articles of agreement with William Stephenson, or authorizing any other person to do so; says he received no part of the consideration; admits the entry and grant in favor of himself and his brother Jesse. The answer of Jesse Turpin admits the entry made in the name of himself and James, the 16th of June, 1800, and the issuing of the grant thereon on the 24th of August, 1803, and admits the execution of the agreement with William Stephenson, the 11th of November, 1805, in his own name and the name of his brother James, said James *Page 112 
not being present; that he received for said agreement a horse, estimated at $125, and a note for $50, to be paid the 25th of December then next ensuing. That said horse was warranted to be sound, but in fact was unsound, being then diseased with the yellow water, of which he died in 48 hours after he received him; says he left the note of $50 with one William Dorris to receive the money from Stephenson, but that the same had not been paid; that he does not consider himself bound to convey the said land until he receive the value of said horse. He admits the recovery against him for $1,890, and says that all his property was sold under the same, and that he hath, with his brother James, conveyed to King Carr 220 acres, the locator's part. The answer to John Carr admits the issuing of the grant to the Turpins, 24th of August, 1803, and that, by order of Yandle to the sheriff of Sumner, 370 acres of the Turpin claim were conveyed to him, and that, with Yandle he conveyed 255 acres there of to Marshall for $765; that the 155 acres of the Turpin claim in Smith county were sold to him as purchaser at sheriff's sale, under the judgment of Ogilvie of the right of Esther Stephenson to the same, for the sum of $81, and that he has gotten a deed for the same. The answer also sets up another title to part of the Turpin land under Berry and Williams. The answer of Marshall admits the purchase of 225 acres, but says he is a purchaser for a valuable consideration without notice. It appears from the testimony in this case that the contract between William Stephenson and Jesse Turpin took place at the house of William Donelson, to which place they came for the purpose of trading. That Turpin was advised to sell, as the price was enough for the warrant, and the obtaining the land was doubtful from the claims of Williams and Barry. That Jesse Turpin got a horse worth $80 or $100, and Stephenson's note for $50, which note, from *Page 113 
the deposition of William Dorris, was to be paid by Stephenson when the title was made by Turpin. On this the recovery by the plaintiff was resisted by the defendant's counsel on the following grounds: First, that there was no consideration to the Turpins for this agreement; secondly, that if there was a consideration, yet the agreement belonged to the personal representative; thirdly, that James Turpin was not bound, not having executed it.
As to the first ground, that there is no consideration; here a horse was delivered and a note for $50; but, say they, the horse was distempered and died in a few days in consequence thereof; and this was known to Stephenson at the time of transferring him and so amounted to a fraud. The testimony that the horse was sick coming to Donelson's from having eaten too much corn, as Stephenson said, and his having died soon after, is not evidence of a distemper or unsoundness, for it is often found that horses die from repletion or eating too much. It is true the alternative much oftener takes place, that they recover from this indisposition. It never has, as far as I have been able to learn, been understood that a house thus affected has been considered in such a state of unsoundness, even if death ensues, as to taint the seller with fraud. The idea accompanying distemper or unsoundness, amounting to fraud, is such an affection as, if it does not take life, at least diminishes the value, presupposes a disease of some standing, and a knowledge by the vendor of these circumstances and their consequences. Do the proofs in this cause show the one or the other? It is believed they do not. What are they? About a mouth or six weeks before the transfer, William Stephenson purchased the horse from Ogilvie, for a sound price, to meet this case. He was then well, and so remained until the journey to Donelson's, and at some point in the journey we find him first indisposed. If he had been so before this time, is it not probable it would have been *Page 114 
discovered, and would have been shown here to have been the case? I think it is probable, from a view of the industry used in this case. Another circumstance repelling the suggestion of fraud by William Stephenson in this case, is an absence of those circumstances usually concomitant therewith, as denial of facts, evasive conduct, shuffling pretences, and the presence of the reverse, open and ingenuous conduct. The conduct of Jesse Turpin, after this unfortunate event, may be called in to illustrate the character of this transaction. Does he come into the neighborhood of William Stephenson and inquire about the present distemper? Does he take the necessary steps to discover the facts, and to establish what is alleged to be a fraud? No. Does he any equivalent act whatever indicative of a belief of a fraud? No. His saying he was cheated may be well accounted for on the principle of recent loss and disappointed hopes, which a short time and cool moments soon rectified. If there was, then, no fraud in this ease, the failure of a part, though the greatest part, of the consideration, occasioned by a subsequent contingent event, to which the case was from its nature subject, is not regarded by equity as a reason for not enforcing the agreement. Newland, 82. Besides, the failure for a part of the consideration, entering not into the essence of the contract, lies in compensation. That it was of this kind plainly appears from the nature of the contract itself, as proved by William Donelson's deposition. No particular circumstance seems to have been aimed at, as being peculiarly within the view of the party, the non-existence of which would have forbidden his assent. It is the common ease of a quantum of price, or failure of part-performance, which lies in compensation. The second point is, though there was a consideration, yet the agreement belonged to the personal representative. A covenant by Jesse Turpin to convey his father's land, of 640 acres, *Page 115 
reserving the locator's part, if appropriated on Goose Creek; if not, then the warrant to convey by special deed when the grant came forward. After a contract has been entered into, the vendor from that time is considered in equity to be trustee for the purchaser, and the vendee, as to the equivalent he is to give for the thing purchased, a trustee for the seller; in consequence of this rule, if real estate be the subject of the agreement, the land contracted to be purchased will, upon the death of either of the parties to the contract, belong to the same persons who would have been entitled to it had a conveyance of the estate been executed. Therefore, upon the death of the vendor before the execution of the conveyance, although the legal estate in the land agreed to be sold devolves upon his heir, yet his executor or administrator will be entitled to receive the purchase-money. So, upon the death of the vendee, his equitable interest in the land will descend to his heir, or will pass by his will under general words descriptive of real estate. Newland, 43. This doctrine results from a well-known rule, in equity, but what is agreed to be done is considered as done. Thus money agreed to be laid out in land is considered as land, and land agreed to be turned into money is considered as money; for the nature of the thing is changed by the agreement, of which it is the business of a court of equity to enforce the execution. Newland, 45. Hence it follows that, in the agreement between William Stephenson and Jesse Turpin, the latter became a trustee for the former, and the land in equity became his land, and upon his death descended to his heir, the complainant. Dig. Ch. Ca. 251; Newland, 22, 25. It is conceived that the cases from Toller, Ba. Ab. and.Com. Dig., respecting a breach of covenant before or after the testator's death, which have been cited as well on the one side as on the other, are illustrative of the present point. They go to show to whom damages belong when damages are *Page 116 
incurred; and when they are, the remedy given by suing; and it is immaterial whether the examples adduced are these wherein the damages are given to the executor or to the heir. They both establish the same principle. To take one case for an example. If a man covenants with a bishop and his successors to repair a rectory demised the grantee of the bishop may have covenant for breach in his lifetime, says the case; why? because the injury is done to the bishop's possession. It follows, that if the breach had happened after his death, then the successor would have had covenant for the breach; why? because the injury was done to the successor. The principle of these rules is, that he who has the right shall have the remedy; he who receives the injury shall have the recompense. And as for any application that earn be made, it operates in favor of the complainant. Who had the right to the land by and under the agreement? The complainant. Who would have been most injured upon a breach? The complainant. She is then entitled to what? to damages? To something superior to damages; to the land itself; and to this agreement, the evidence of her light, the muniment of her inheritance, she is entitled also, and the administrator is not, nor ever was. But the administrator, by his counsel, contends that, having got this instrument, though improperly, and having used it, though improperly, he is justifiable on this ground, that as, by law, the real as well as personal estate is liable for the payment of the debts of the intestate, her ancestor, and as, in the present case, the personal estate was sufficient for the payment of the debts, and the real estate must have contributed to this payment, and then only was she entitled to the surplus, if any, it matters not in this instance. To this the answer is,lex non ita scripta est, and that it ought not to be so this cases furnishes a cogent example, it seems to be well settled that the inheritance of the heir, or in other *Page 117 
words the lands of a minor, shall not be affected and bound without an opportunity of defence; that he shall have notice of the claim, and the power given him of contesting it, before his lands shall be charged thereby. The law, therefore, disallows of any and all proceedings that deprive him of this notice, that rob him of this defence. 1 Hay. 71. It will not even intrust his interest to the care of those who may be presumed to be favorable, and embarked in the same interests; to-wit, the protection of the personal property. It will not permit the establishment of a claim against the personal representative, the executor, by judgment, even to affect his inheritance, without a further proceeding against himself. See the Act of 1784, c. 11, which shows that in all cases the judgments against executors or administrators, although these by the justice of the demand may be established, and upon the issues found respecting the assets, it must be satisfied out of the real estate in the hands of the heir; yet an opportunity is given, before he is charged, by having a scire facias served on him (sect. 2); and when the heir is a minor, by having the scire facias served on the guardian; and when there is no guardian, the Court shall appoint one to defend the suit for the infant. And by the Act of 1789, c. 39, in cases where the heir is liable to the debts of the ancestor, without the intervention of the executor or administrator, by virtue of land descended to him: yet where such heir is a minor, and having a guardian, the leading process should be served on such guardian, and when a minor shall have no guardian, then the Court shall appoint a guardian to defend the suit for said minor: If the law is so careful of protecting the interests of the heir, and of having him defended in case of his infancy, by open and public and direct proceeding, will it permit its views and intentions to be completely evaded and disappointed by indirect proceedings? Surely not. The right then of the complainant in this case, by the suit of the *Page 118 
administrator against the Turpins, is not affected. Neither is her right affected by the suit of Ogilvie, being no party thereto, and it being res inter alios acta with regard to her.
The third point is, that James Turpin, not having executed the agreement, is not bound. It appears from the testimony of William Donelson that the father of the Turpin was killed by the Indians at the place called the battle ground, upon Sycamore, in the year 1780. That he was entitled to a pre-emption, and in 1783 a certificate was issued by the commissioners to that effect; that Jesse Turpin was, at the time of his death, his eldest son. By the Act of 1783, c. 52, the right of the heirs of those who died entitled to pre-emptions is recognized to their pre-emptions. As the law stood before the Act of 1784, the eldest son Jesse was heir, and entitled to this pre-emption to the exclusion of the younger son, his brother, the defendant James. The right being vested in Jesse, it remains to be inquired, was he divested of the right to this pre-emption, or any part thereof, afterwards and before the agreement with William Stephenson; and how? On the sixteenth of June, 1800, an entry was made in the entry taker's office of Davidson county, in the joint names of Jesse and his brother James, as heirs of their deceased father, James Turpin; and on the twenty-fourth of August, 1803, a grant issued on said entry to Jesse and James. This is all the evidence as to this point. Do the entry and the grant, by force of uniting James the younger brother, with Jesse the elder and heir, divest the heir of one-half, and vest it in James? It is a principle of law, that, if a man purchase an estate, and does not take the conveyance in his own name, the trust of the legal estate results whether freehold or otherwise, and his whether taken in the name of the purchaser, or another jointly, or in the name of others without the purchasers, whether in one name or several, results to the man who advances the purchase-money or to him from *Page 119 
whom the consideration moved, Sug. 414, 415, 418; and that to repel this principle it must be proved that the man from whom the consideration moved did not mean to purchase in trust for himself, but intended a gift to a stranger. Sug den, 418. Apply this principle to the present case. The entry and grant operate as a conveyance to transfer from the State the State's title to the land therein contained. What is the consideration? The being heir to James Turpin, who, by law, acquired the right by performing the meritorious services; and this descended to his heir Jesse, but this right did not descend to any other son. If the issuing of the grant in any other manner than it ought to issue, as to a stranger to the right, or, as in the present case, to a person entitled and a stranger jointly, were to be evidence of title, it would follow that men's lands would be in the power of the officers of the land office. This view of this part of the case would entitle the complainant to relief against the defendant James Turpin, who, in the entry and grant, only can be considered as a trustee for the defendant Jesse Turpin. But the complainant in his bill not having made the necessary allegations to bring to the view of the Court the facts and circumstances forming this part of the case, and not resting his title to relief on any facts previous to the entry in the name of the Turpins, notwithstanding these facts appear in the answers and testimony, it is doubtful whether the Court can act upon them. At present they think they can not. The next question is, whether the complainant is entitled to relief against the said James as a party to the articles of agreement. That he did not execute them in person is evident, for he was not present. Did he authorize his brother Jesse to do so for him? There is no testimony of any express authority given before the execution of the articles by Jesse; and the circumstances for implying this are considered too weak to warrant such an inference. The offer of James, *Page 120 
together with Jesse, to make a title or a conveyance, after the judgment against them upon the articles, is not ad idem. James might have been willing to have done so without the previous obligation arising from the execution of the articles, that is to say, he might have been induced to do so by the presence of the judgment, and the obtaining relief from it, as the ground and object of his offer. But it does not follow that, because he was willing under these circumstances to make a conveyance of his interest, he was originally a party to the articles; and there is no admission by him at any time, or other proof, that he was so. This is different from the case of confirmation; there a previous act is done, and the proof lies in showing a subsequent assent to such previous act. Here the proof of the original act is wanting. And proof that it is applicable to the one case is by no means so in the other. Therefore I am of opinion that all sales of the estate which Jesse Turpin had by virtue of the grant issued by the State of North Carolina, the twenty-fourth of August, 1803, should be set aside, and derived under any writ or writs of execution grounded on the judgment obtained by the administratrix, Esther, against the Turpins, and all sales and conveyances by any person claiming under such sales and conveyances, and that all titles and claims derived, mediately or immediately, therefrom, be set aside; and that all sales of the said land derived under the judgment obtained by Ogilvie against the administrator and administratrix of William Stephenson be set aside, and all claims under such sales. And that the complainant be entitled to the articles of agreement, for the sale of the said land, to her ancestor William Stephenson, and to the exclusive possession and benefit thereof, and be entitled to all the remedies and actions which her ancestor would have been entitled to if living; and the complainant shall pay to the said Jesse Turpin $100 within one year from this day. And also, that *Page 121 
all persons be prohibited from setting up all or any remedy to any action she may bring, or be entitled to, which could not be set up against the ancestor.
Roane, J., after stating the facts, proceeded thus: On this state of the case, leaving the defence of the two Turpins, for the present, wholly out of view, and considering them by virtue of the covenants as trustees for William Stephenson in his lifetime, is Irene Stephenson, the sole heir of the deceased, entitled to any proof against Yandle, Carr and Marshall? or, in other words, will the equitable estate created by this covenant descend to the heir and be vested in her on the death of her ancestor, so as to exclude all right in the administrators to intermeddle therewith, or change it from real estate to personal by any suit or proceeding to which the heir is not a party? If the administrators had a right to sue the obligors, it will follow, as a necessary consequence, that the covenant is merged in the judgment, and her equitable right to the land is forever gone, and she, as distributee, can only claim the amount recovered, or as much of it as can be had. If, on the contrary, the administrators had no right to commence such suit, it appears equally certain that all the proceedings on the attachment and sales made of the land by virtue of executions founded on the judgment, can not affect her interest, but as to her who was no party, are absolute nullities, and purchasers can acquire no title. On the death of the ancestor, the real estate immediately descends, and vests in the heir, of which he can not be divested but by his own act in some suit or proceeding to which he is either actually, or in contemplation of law, a party; a bond for conveyance of land in equity is considered as land, and the vendor a trustee for the vendee. Here unquestionably the bond or article belongs to the complainant, on her ancestor's death. Had the time for performance arrived, and breach made in the life of the ancestor, if might be argued with some plausibility that a right to damage *Page 122 
had accrued, which being personal, belonged to the administrrator. But perhaps this would only be considered a plausible argument, though it is unnecessary now to decide that point, as the breach here was after the death of the ancestor the administrators had no right to the bond, or to commence suit on it. A consequence of this position is, that all recoveries of such bond by those not entitled to it are absolutely void, as against the party who is entitled; and all purchasers under sales made by execution, by virtue of such void judgment, purchase subject to all the equity, and subject to such claims upon the land as third persons have; in the present case subject to the complainant's equity, founded upon the articles. The judgments and sales made by virtue thereof being absolutely void as against the heir, a subsequent purchaser by sale made by the purchaser at sheriff's sale, can not protect himself by the plea of want of notice. This will include the purchases made by Yandle and Carr, and by Marshall from them, as also the purchase made by Esther Stephenson; nor can the purchase by Carr of her right under the sale made by virtue of Ogilvie's judgment be supported, she having no right; the land could not be sold to satisfy Ogilvie's judgment without bringing in the heir to defend. Let the decree be made to this effect, and in substance agreeing with that proposed by my brother judge Haywood, J., having been concerned in the cause as counsel, gave no opinion. A decree was drawn according to the above direction, and read to the Court, and, being corrected by them, was ordered to be put on record.